IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| IN RE:<br><br>**EARLY LEARNING LANGUAGE ACADEMICS, LLC**<br><br>**Debtor** | Case No.: 19-20397-LSS<br>Chapter 11 |

**UNITED STATES TRUSTEE'S OBJECTION TO**
**DISCLOSURE STATEMENT**

John P. Fitzgerald, III, the Acting United States Trustee for Region 4 ("the United States Trustee"), by counsel, files this Objection to the Disclosure Statement.  The Disclosure Statement should not be approved because it describes a Plan that is not confirmable in that the Plan proposes to pay like creditors differently, which violates a core principle of bankruptcy law. Moreover, the Debtor has not filed the Plan in good faith.  The Debtor has the financial wherewithal to pay all creditors in full in a short period of time; however, instead of paying unsecured creditors in full, the Debtor is proposing to pay a subgroup of unsecured creditors only 18% of claims over a two-year period.  In further support of this objection, the United States Trustee states as follows:

Under 11 U.S.C. § 1125(b), a debtor has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to enable a creditor to make an informed judgment about the plan.  11 U.S.C. § 1125(a)(1).  Section 1125(a)(1) defines "adequate information" in pertinent part as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the

1

> holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. §1125(a)(1).

"The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the Debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.,* 337 F.3d 314, 322 (3d Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004) (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988)). Further, "[c]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, therefore the importance of full and honest disclosure cannot be overstated." *Id.* at 232 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996)).

In light of the critical importance that a disclosure statement contain adequate information that a reasonable investor would need in order to make an informed judgment about a plan, prior case law has set forth a non-exhaustive list of relevant factors for evaluating the adequacy of a disclosure statement, which include and are not limited to:

> (1) The events which led to the filing of the bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the

> accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' fees and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) actual and projected realizable value from the recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 & n.6 (Bankr. E.D. Pa 2001) (*quoting In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)).  A review of the *Phoenix Petroleum* list of relevant factors shows that the Disclosure Statement does not provide adequate information.

In addition, the Disclosure Statement must describe a Plan that is confirmable.  "It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." *In re Crimmi Mae, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000) (citing *In re Allied Gaming Mgmt, Inc.*, 209 B.R. 201, 202 Bankr. W.D. La. 1997); *In re Wong*, 598 B.R. 827, 829 (Bankr. Dr. Md. 2019) ("While Courts ordinarily reserve confirmation issues for the confirmation hearing, a court may disapprove a disclosure statement where the underlying plan is clearly unconfirmable.").

**The Plan Should Not Be Confirmed Because It Treats Like Claims Differently**.

In this case, the Disclosure Statement should not be approved because it separately classifies similarly situated claims in violation of Section 1122 and treats like claims differently in violation of Section 1123(a)(4).  Section 1122 states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  Section 1123(a)(4) states that a plan shall "provide the same

3

treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

The Fourth Circuit has ruled that a Debtor may not separately classify like claims for purposes of gerrymanders or if the classification violates basic priority rights.

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to classify creditors.... The potential for abuse would be significant otherwise.... If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.

*In re Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir. 1992); *see also See In re Deming Hospitality, LLC,* 213 WL 1397458 (Bankr. D.N.M. April 5, 2013); *Dow Corning Corp.*, 280 F.3d at 659–60 (Section 1123(a)(4) was violated where Canadian governmental agencies accorded far more effective rights than United States); S*chroeder v. New Century Liquidating Trust (In re New Century TRS Holdings)*, 407 B.R. 576, 592 (D. Del 2009) (Section 1123(a)(4) violated where plan provided a 100% distribution to some claims in a given class and 130% to other claims in that same class).

"If a creditor objects to the classification scheme on gerrymandering grounds, most courts require the plan proponent to justify the classification."  *See In re Deming Hospitality, LLC,* 213 WL 1397458 (Bankr. D.N.M. April 5, 2013)*(citing  In re Dean,* 166 B.R. at 949 (Bankr.D.N.M.1994) (debtor must demonstrate reasons apart from gerrymandering to separately classify); *In re Barakat,* 99 F.3d 1520, 1526 (9th Cir.1996), *cert. denied,* 520 U.S. 1143, 117 S.Ct. 1312, 137 L.Ed.2d 475 (1997) (separate classification of similar claims requires a "legitimate business or economic justification"); *In re Tucson Self–Storage, Inc.,* 166 B.R. 892,

898 (9th Cir.BAP1994) (placed justification burden on debtor); *In re Heritage Organization, LLC,* 375 B.R. 230, 303 (Bankr.N.D.Tex.2007) (discussing when separate classification justified). *See also Spring Creek,* 187 B.R. at 683, n. 4 (collecting cases). *See also Boston Post Road Ltd. P'ship v. F.D.I.C. (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 483 (2nd Cir.1994) ("the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims."); *In re Adelphia Communications Corp.*, 368 B.R. 140, 246–247 (Bankr.S.D.N.Y.2007) ( "Although section 1122(a), by its terms, doesn't require that all similarly-situated claims be classified together, caselaw has made clear that separate classification of substantially similar unsecured claims is permissible only when there is a reasonable basis for doing so or when the decision to separately classify 'does not offend one's sensibility of due process and fair play.' ") (quoting I*n re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr.S.D.N.Y.1993)).

In this case, the Debtor splits the unsecured creditors into two classes: Class 7 contains the class of three employees each of whom has filed a complaint against the Debtor for unpaid wages under the Fair Labor Standards Act, and Class 8 contains the rest of the unsecured creditors. The Debtor disputes each of the three claims in Class 7. The Debtor proposes to pay whatever claims are allowed in Class 7 a total of $50,000. If all three claims in Class 7 are allowed, the class size would be $114,071, and Class 7 claimants would receive a distribution of approximately 44% of its claims. The Debtor also proposes to pay $50,000 to Class 8. However, given the larger size of Class 8 ($271,406), the distribution to the Class 8 claimants is significantly smaller than the distribution to Class 7. Whereas Class 7 would receive 44% of its claims, Class 8 would receive only 18% of its claims. It appears that the Debtor is attempting to gerrymander the classes to entice Class 7 to accept the Plan with a higher distribution so it can

force a lower distribution upon Class 8. *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir.1991); *see also Boston Post Road Ltd. P'ship v. F.D.I.C. (In re Boston Post Road Ltd. P'ship),* 21 F.3d 477, 483 (2nd *Cir.1994)* ("similar claims may not be separately classified solely to engineer an assenting impaired class [.]") (citing *Greystone*, 995 F.2d at 1279) (remaining citations omitted). At the very least, to dispel the gerrymandering suspicion, the Debtor should be required to amend the Disclosure Statement to explain why the Debtor seeks to split the unsecured claims into Class 7 and Class 8, and why Class 7 is deserving of a higher percentage distribution.

**The Plan Should not be Confirmed Because it was not Filed in Good Faith.**

Prior to confirming the Plan, this Court must determine that the Debtor filed the Plan in good faith. 11 U.S.C. 1129(a)(3). Although the Bankruptcy Code does not define good faith, good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.' " *In re Waterford Hotel, Inc*., 497 B.R. 255, 266 (Bankr. E.D. Mich.2013) (citations omitted)); *see In re Trenton Ridge Investors, LLC,* 461 B.R. 440, 469 (Bankr. S.D. Ohio 2011) ("Two primary purposes of chapter 11 relief are the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims.") (quoting *Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner),*490 F.3d 21, 25 (1st Cir.2007)). Good faith also generally requires that the plan proponent deal with its creditors in a manner that is fundamentally fair. *In re Harenberg*, 491 B.R. 706, 718 (Bankr. D. Md. 2013) (Court found that plan lacked good faith because debtor will not provide a fair distribution to general creditors); *In re Gregory Boat Co*., 144 B.R. 361, 366 (Bankr. E.D. Mich.1992)). An analysis of good faith is fact-intensive and based upon a totality of the

circumstances. *Fed. Nat'l Mortg. Ass'n v. Village Green I, GP,* 483 B.R. 807, 822 (W.D. Tenn. 2012).

The Fourth Circuit has held in Chapter 13 cases that the determination of whether a Chapter 13 plan was proposed in good faith must be made on a case by cases basis in which the Court must examine the totality of circumstances.[1] *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir.1982) ("the totality of circumstance must be examined on a case by case basis" in determining whether a plan meets the general good faith standard of § 1325(a)(3)). Factors to be considered include, but are not limited to, the percentage of proposed repayment, the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor. *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986). The object of the inquiry is to consider "all militating factors," to determine whether there has been "an abuse of the provisions, purpose, or spirit" of Chapter 13 in the proposal or plan. *Id.* "The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources." *Metro Emps. Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030, 1033–34 (6th Cir.1988).

---

[1] "There is extensive case law defining good faith in the context of the confirmation of a Chapter 13 plan. . . . [I]n the Chapter 11 plan context . . . it is appropriate to borrow concepts of good faith from the Chapter 13 plan confirmation context [.]" (citations omitted)). *Metro Emps. Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030, 1033–34 (6th Cir.1988). "That courts would do so makes sense because *Okoreeh–Baah's* holding is consistent with the approach taken by the courts cited above in the Chapter 11 context" *In Trenton Ridge Investors, LLC*, 461 B.R. 440, 469 (Bankr. D.S. Ohio 2011).

7

In the case at hand, the Debtor has not proposed the Plan in good faith because it does not propose a fair distribution to creditors. As stated above, the Debtor proposes to pay $50,000 to Class 8 creditors, which is approximately 18% of their claims, beginning year four (4) of the plan. While this may be acceptable in cases in which a debtor has limited funds, in this case, the Debtor is supposedly flush with cash. In fact, on page 11 of the Disclosure Statement, the Debtor states that revenue has not been and will not be a concern in this case. The Debtor boasts in the Disclosure Statement on page 11 that, in 2018, it had $2.4 million in revenue and $275,000 in profit. From August 2, 2019, to December 31, 2019, the Disclosure Statement states that the Debtor generated $1.33 million in revenue and $311,000 in profit (a monthly average of more than $62,000). The Profit and Loss Statement, which is attached to the Plan as Exhibit 2, Dkt. 51-2, shows that for the calendar year 2019, the Debtor had net income of $412,618.66.[2] The Debtor's projected income and expenses, which is attached as Exhibit 3 to the Plan, Dkt. 51-3, shows profits exceeding $400,000 in 2020. The Debtor estimates that its profits will increase each year with profits exceeding $430,000 in 2024. In total, the Debtor projects profits to exceed $2.1 million during the life of the plan.

The total unsecured debt in Class 8 is $271,406. If the Debtor's claims of net profit are true, then the Debtor could pay Class 8 in full (100%) on the Effective Date. Even if all the claims in Class 7 are allowed, the Debtor could still pay Class 7 and Class 8 in full (100%) on the Effective Date and still have a profit if its reported profits are accurate. However, instead of paying Class 8 in full on the Effective Date, the Plan proposes to pay Class 8 only $50,000 (18%) over two years beginning year four of the plan, and to pay Class 7 a total of $50,000 (44%) over two years beginning year four of the plan.

---

[2] The United States Trustee recently learned that the Debtor paid its staff bonuses in December 2019 without obtaining court approval.

To make matters worse, in addition to proposing to pay a small percentage of the unsecured claims while retaining millions in profits, the Debtor also intends to pay its owners, Duke and Crystal Esler, more than $300,000 in salary/draw per year.[3] Further, Duke and Crystal Esler do not intend to pay anything to retain their interest in the Debtor while it is profiting millions of dollars unless and until the Debtor is faced with a cram-down situation. Even then, the Eslers only offer to pay $20,000 to retain their interest. For $20,000, the Eslers get to keep their interests in the Debtor, which they believe will profit more than $2.1 million in five years, and they will continue to earn a salary/draw of more than $300,000 per year.

The Debtor's failure to pay their creditors when they have the financial wherewithal is bad faith. This Plan does not propose "a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources."

**The Debtor's Financial Statements are not Supported by the Monthly Operating Reports.**

Attached to the Plan as Exhibit 2 are monthly Profit and Loss Statements for August through December 2019. As the chart below shows, the Debtor's reported income and expenses on the Profit and Loss Statements do not match what it reported on the Monthly Operating Reports.

| Month | Net Income as Shown on Profit and Loss Statements | Net Income as Shown on Monthly Operating Reports | Bank Balance |
|---|---|---|---|
| **August** | $142,518.59 | $127,063 | $129,294 |
| **September** | $47,904.08 | $16,463 | $145,642 |
| **October** | $12,414.57 | ($40,396) | $105,039 |

---

[3] The December 2019 Monthly Operating Report shows that Mr. Esler took $89,638 in draws. During this bankruptcy case, from August – December 2019, Mr. Esler's draws totaled $244,597. The Disclosure Statement, p. 10, however, shows that Mr. Esler's draws are $208,000 per year. The Debtor needs to explain this difference.

| November | $46,352.19 | $5,729 | $110,337 |
|---|---|---|---|
| December | $62,739.64 | ($26,898) | $83,440 |
| Total | $311,929.07 | $81,961 | |

Although January was not reported on the Profit and Loss Statements that were attached to the Plan[4], the monthly operating report for January 2020 shows a loss for the month and a reduced bank balance.

| January 2020 | | ($36,259) | $52,055. |
|---|---|---|---|

The Debtor should explain in the Disclosure Statement why its bank balance decreased from $129,294 to $52,055 during the time that it reported net profits on its Profit and Loss Statements of $311,929.07. The Debtor should also explain why the net profits as shown on its Profit and Loss Statements ($311,929.07) are significantly higher than what is reported on the monthly operating reports ($81,961).

The Debtor's claim of earning $311,000 in net profits from August 2, 2019 through December 31, 2019, is also deceiving because the Debtor appears to have received approximately $180,000 in August 2019 for prepayment of tuition for the academic year. The Disclosure Statement fails to mention the prepayment of tuition and how such impacted net income in August 2019, and how it will impact gross income for the remainder of the academic year.

---

[4] The Profit and Loss Statement attached to the January 2020 Monthly Operating Report shows a profit of $9,615.67.

**The Plan Violates Section 1129(a)(9)(C).**

The Disclosure Statement should be denied because it describes a Plan that violates Section 1129(a)(9)(C). Section 1129(a)(9)(C) states that priority tax claims must be paid within five (5) years of the Petition Date. The Plan proposes to pay priority tax years in twenty (20) quarterly installment, which is five years. Given that the case was filed in August 2019, the Debtor has less than 4.5 years to pay priority taxes in full. The Plan fails to state when the quarterly installments will begin.

**The Projections are Lacking.**

The Debtor should also amend its projections to include the following: (1) beginning and ending cash balances, (2) plan payments to be made each year, and (3) draws by Mr. Esler.

As shown, the Disclosure Statement cannot be approved absent amendments. Wherefore, the United States Trustee respectfully requests that the Disclosure Statement be denied and for such other and further relief as is just.

Respectfully submitted,

Dated: February 19, 2020

John P. Fitzgerald, III
Acting United States Trustee for Region 4
By Counsel:

*/s/ Lynn A. Kohen*
Lynn A. Kohen, Bar No. 10025
Trial Attorney
Office of the U. S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland 20770
(301) 344-6216
(301) 344-8431 (fax)
E-mail: lynn.a.kohen@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the 19th day of February 2020, a copy of the foregoing Objection to the Disclosure Statement was served by ECF notification to:

Richard L. Gilman     rgilman@gilmanedwards.com, kedwards@gilmanedwards.com; elivingston@gilmanedwards.com;chamilton@gilmanedwards.com;gilmanrr71225@notify.bestcase.com

And by first-class mail, postage prepaid, to:

Early Learning Language Academies, LLC
10020 Pebble Beach Terrace
Ijamsville, MD 21754

                                        */s/ Lynn A. Kohen*
                                        Lynn A. Kohen